IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

GINA DEROSSETT,                          )
                                         )
         Plaintiff,                      )
                                         )
v.                                       )     CASE NO. 3:22-cv-611-JTA
                                         )        (WO)
MARTIN J. O'MALLEY,[1]                    )
Commissioner of Social Security,         )
                                         )
         Defendant.                      )

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U.S.C. § 405(g), the claimant, Gina Derossett ("Derosett") brings this action to review a final decision by the Commissioner of Social Security ("Commissioner"). (Doc. No. 1.)[2] The Commissioner denied Derossett's claim for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (R. 12-28.)[3] The Court construes Derossett's brief in support of her Complaint (Doc. No. 17) as a motion for summary judgment and the Commissioner's brief in opposition to the Complaint as a motion for summary judgment (Doc. No. 20). The parties

---

[1] Martin J. O'Malley was appointed Commissioner for the Social Security Administration on December 20, 2023 and is automatically substituted as the defendant. *See* Fed. R. Civ. P. 25(d).

[2] Document numbers as they appear on the docket sheet are designated as "Doc. No."

[3] Citations to the administrative record are consistent with the transcript of administrative proceedings filed in this case. (*See* Doc. No. 16.)

have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).

After careful scrutiny of the record and the motions submitted by the parties, the Court finds that Derossett's motion for summary judgment is due to be GRANTED, the Commissioner's motion for summary judgment is due to be DENIED, the decision of the Commissioner is due to be REVERSED, and this matter is due to be REMANDED for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.      PROCEDURAL HISTORY AND FACTS

Derossett is an adult female with a two-year college degree in cosmetology who previously worked as a hairstylist. (R. 31, 33, 35). She is a person of advanced age.[4] 20 C.F.R. §§ 404.1563(e), 416.963(e).

Derossett filed an application for a period of disability and DIB under Title II of the Social Security Act and filed a Title XVI application for SSI. (R. 162-70.) She alleged a disability onset of August 27, 2020, due to migraines, a pinched nerve in her upper back, arthritis in both hands and both knees, and left hand and lower back problems.[5] (R. 40, 42,

---

[4]  According to the hearing transcript, Derossett testified at the hearing that she was born in 1953, in which case she would have been 68 years old at the time of the administrative hearing and 67 years old on the alleged date of onset of disability. (R. 18, 31, 54, 162.)  However, the transcript testimony appears to be in error. In her application for benefits, she stated that she was born in 1963, in which case she would have been 58 years old at the time of the administrative hearing and 57 years old on the alleged date of onset of disability. (R. 18, 33, 54, 162, 164.) Medical records indicated a birthdate in 1953. (*See*, *e.g.*, R. 321.) The parties make no age-based argument regarding Derossett's eligibility for DIB or SSI benefits.

[5]  At the administrative hearing, Derossett also alleged that she suffered from attention deficit hyperactivity disorder, insomnia, plantar fasciitis, scoliosis, and hemorrhoids. (R. 42, 44-45, 49-50.)

188.) The claim was originally allowed, but the Office of Quality Review ("OQR") returned the claim, "indicating that more information regarding [Derossett's] physical function was required to support" a residual functional capacity of light work. (R. 406.) In addition, OQR noted that there was no indication why past work was marked as "not relevant." (*Id*.) Therefore, the Commissioner sought further medical records and clarification from Derossett. (*Id*.) Subsequently, at the level of initial review and reconsideration, the Commissioner found that the claim was not supported. (R. 87, 92, 100, 105.) Derossett requested an administrative hearing. (R. 108-115.)

Following the administrative hearing, the Administrative Law Judge ("ALJ") returned an unfavorable decision on January 20, 2022. (R. 12-23.) Derossett sought review by the Appeals Council, and it denied her request. (R. 1-3.) Thus, the hearing decision became the final decision of the Commissioner.[6]

On October 13, 2022, Derossett filed this civil action for judicial review of the Commissioner's final decision. (Doc. No. 1.) The parties have briefed their respective positions. (Docs. No. 17, 20, 21.) This matter is ripe for review.

## II.    STANDARD OF REVIEW

Judicial review of disability claims is limited to whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). "The

---

[6] "When, as in this case, the ALJ denies benefits and the [Appeals Council] denies review, [the court] review[s] the ALJ's decision as the Commissioner's final decision." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citation omitted).

Commissioner's factual findings are conclusive" when "supported by substantial evidence." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). "Substantial evidence" is more than a mere scintilla and is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1346, 1349 (11th Cir. 1997)). Even if the Commissioner's decision is not supported by a preponderance of the evidence, the findings must be affirmed if they are supported by substantial evidence. *Id.* at 1158-59; *see also Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not find new facts, reweigh evidence, or substitute its own judgment for that of the Commissioner. *Bailey v. Soc. Sec. Admin., Comm'r*, 791 F. App'x 136, 139 (11th Cir. 2019); *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004); *Dyer*, 395 F.3d at 1210. However, the Commissioner's conclusions of law are not entitled to the same deference as findings of fact and are reviewed *de novo*. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

Sentence four of 42 U.S.C. § 405(g) authorizes the district court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court may remand a case to the Commissioner for a rehearing if the court finds "either ... the decision is not supported by substantial evidence, or ... the Commissioner or the ALJ incorrectly applied the law relevant to the disability claim." *Jackson v. Chater*, 99 F.3d 1086, 1092 (11th Cir. 1996).

### III.   STANDARD FOR DETERMINING DISABILITY

An individual who files an application for Social Security DIB and SSI must prove that she is disabled.[7] *See* 20 C.F.R. § 404.1505; 20 C.F.R. § 416.920. The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).

Disability under the Act is determined under a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520. The evaluation is made at the hearing conducted by an ALJ. *See Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018). First, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial gainful activity" is work activity that involves significant physical or mental activities. 20 C.F.R. § 404.1572(a). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of impairments that significantly limit the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Absent such impairment, the claimant may not claim disability. *Id.* Third, the ALJ must determine whether the claimant meets or medically equals the criteria of an

---

[7] Although DIB and SSI are separate programs, the standards for determining disability are identical.  *See Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986); *Miles v. Soc. Sec. Admin., Comm'r*, 469 F. App'x 743, 744 (11th Cir. 2012).

impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1. If such criteria are met, then the claimant is declared disabled. 20 C.F.R. § 404.1520(d).

If the claimant has failed to establish that she is disabled at the third step, the ALJ may still find disability under the next two steps of the analysis. At the fourth step, the ALJ must determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments. 20 C.F.R. § 404.1520(e). The ALJ must determine whether the claimant has the RFC to perform past relevant work. 20 C.F.R. § 404.1520(f). If it is determined that the claimant can perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1560(b)(3). If the ALJ finds that the claimant is unable to perform past relevant work, then the analysis proceeds to the fifth and final step. 20 C.F.R. § 404.1520(g)(1). In this final analytical step, the ALJ must decide whether the claimant is able to perform any other relevant work corresponding with her RFC, age, education, and work experience. 20 C.F.R. § 404.1560(c). Here, the burden of proof shifts from the claimant to the ALJ in proving the existence of a significant number of jobs in the national economy that the claimant can perform given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

## IV.   ADMINISTRATIVE DECISION

Within the structure of the sequential evaluation process, the ALJ in this case found that Derossett met the insured status requirements of the Social Security Act through December 31, 2025, but had not engaged in substantial gainful activity since the alleged onset date of August 27, 2020. (R. 18.) The ALJ determined that Derossett suffers from the following severe impairments that significantly limit her ability to perform basic work

activities: cervical degenerative disk disease, cervical radiculopathy, polyosteoarthritis, and vitamin D deficiency. (R. 18.) The ALJ determined that Derossett suffers from the following non-severe impairments: hyperlipidemia and nicotine dependence. (*Id*.)

The ALJ concluded that Derossett does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 19.) The ALJ explained:

> The objective record fails to contain the objective findings and clinical signs set forth in any of the listing sections pertaining to the claimant's severe impairments. The undersigned specifically considered the musculoskeletal listings 1.15, 1.16, 1.18 but these listings were not met because some of the constitutional symptoms are not established by the file and there is no documented requirement to use an assistive device. In an abundance of caution[, the] listing 14.09 for inflammatory arthritis was also considered. Again, some of the constitutional symptoms are not established by the file and the evidence does not support marked limitations in activities of daily living, maintaining social functioning, or in completing tasks in a timely manner.

(R. 19.)

After consideration of the entire record, the ALJ determined Derossett retains the RFC

> to occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand/walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday with customary breaks; perform no work at unprotected heights; perform no operation of handheld vibrating equipment (involving significant vibration, such as a power tool or a jackhammer). 20 CFR 404.1567(c) and 416.967(c)[8.]

---

[8] 20 C.F.R. §§ 404.1567(c) and 416.967(c) define "medium work" as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."

(R. 19.)

In assigning this RFC, the ALJ found Derossett's impairments could reasonably be expected to cause some of the alleged symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." (*Id*.) In support of this finding, the ALJ summarized the available medical records. (R. 19-22.) The ALJ also considered Derossett's testimony at the hearing. (R. 22.)

Based upon the testimony of a vocational expert ("VE"), the ALJ determined that Derossett is able to perform her past relevant work as a cosmetologist as that work is generally performed. (R. 22-23.) The VE also testified that Derossett's past relevant work as a cosmetologist could be performed by someone of Derossett's age, education, work experience, and RFC, and who had the following additional limitations: "occasionally lifting and/or carrying twenty pounds and frequently lifting and/or carrying ten pounds, she could not perform overhead work, and she could only frequently push/pull with the bilateral upper extremities." (R. 23, 51-52.)

The ALJ concluded that Derossett had not been under a disability from the alleged disability onset date through the date of the ALJ's decision. (R. 23.)

## I.   DISCUSSION

Derossett presents three issues for review. (Doc. No. 17 at 1.) First, she argues that the ALJ failed to develop a full and fair record and evaluate all prior administrative findings. (*Id*. at 6-9.) Second, she argues that new and material evidence requires remand

under sentence six of 42 U.S.C. § 405(g). (*Id*. at 9-13.) Third, she argues that the ALJ failed to provide sufficient reasons for rejecting Derossett's subjective testimony as to the limiting effects of her impairments and other symptoms. (R. 13-16.) For reasons of efficiency, the Court will review these issues out of order.

A.    Consideration of Derossett's Testimony Regarding Inability to Afford Medical Care

On appeal, Derossett argues that the ALJ erred by failing to provide sufficient reasons for rejecting her subjective testimony regarding the limiting effects of her impairments and by failing to consider her testimony that she was unable to afford her prescribed medications or obtain more extensive medical treatment.

1.    Derossett's Testimony and Medical Records

At the administrative hearing, Derossett testified that, in August 2020, she was sent to physical therapy to recover full use of her left arm after being injured in a minor car accident. (R. 37-38.) The medical record indicates that, on August 5, 2020, Derossett saw her primary care provider, whom she had not seen since 2019. (R. 334.) Derossett complained of stabbing left elbow and wrist pain for which she had taken Aleve and Tylenol with no relief from the symptoms. (R. 334.) The primary care provider gave Derossett Decadron, Depo-Medroll, and Toradol at the office visit and referred her to orthopedics for further evaluation and treatment. (R. 336.) The primary care provider also "discussed the importance of monitoring intake of nonsteroidal anti-inflammatory medication." (*Id*.)

On September 18, 2020, Derossett was seen by Dr. Orvis Chitwood, III, M.D. (R. 409-10.) She complained of "pain from the left shoulder blade radiating down the left arm

to the hand and to the left side of her neck." (*Id*.) "She also ha[d] some numbness in the left little and ring fingers." (R. 409.) In addition, she also stated that it felt "like an ice pick [was] being stuck in her left elbow." (*Id*.) Her symptoms had been "going on for 2 months." (*Id*.) The pain came and went, could "be up to an 8 or 10/10," and was "worse when she d[id] her job as a hairdresser." (*Id*. at 410.) Dr. Chitwood reviewed a cervical spine x-ray and determined that it showed "C6-7 degenerative disc disease with a loss of the normal cervical lordosis." (R. 411.) He diagnosed cervical radiculopathy, "put her on a Medrol Dosepak and some muscle relaxants," and "sen[t] her to [physical] therapy." (*Id*.) If Derossett's symptoms did not improve with this plan, Dr. Chitwood noted, "the next step would be to get an MRI of her neck." (*Id*.)

Derossett went to physical therapy, where she had her initial examination on September 22, 2020. (R. 362-67.) To address painful and decreased cervical range of motion and abnormal posture and awareness, a six-week plan involving physical therapy 2-3 times per week was created. (R. 365-66.) She was noted to have good rehab potential. (R. 365.) Throughout her ensuing physical therapy visits, it was repeatedly noted that she was "progressing" and "improving," had good rehab potential, and would "benefit from continued skilled PT interventions to achieve functional mobility goals." (R. 369, 372, 374, 376-77, 379, 381, 383, 385, 387.) However, she last went to physical therapy on October 21, 2020, short of the recommended six-week course. (R. 386.) Notes from her last physical therapy session indicated that Derossett would "benefit from continued skilled PT interventions to achieve functional mobility goals" and indicated that further physical therapy sessions were anticipated. (R. 387.)

On November 23, 2020, William Blacklund, M.D., completed a medical review of the record for the Commissioner and stated:

> A review of the [medical evidence of record] does show a [claimant] with a somewhat acute LUE radicular pain back in 8/2020, She has started PT with some medication to help alleviate her symptoms. Such treatment does take time to help and, if not, surgery would then be indicated. Her notes are mainly from PT without any follow[-]up [medical evidence] from Dr. Chitwood. [Derossett] was making slow progress in PT so a follow[-]up note from her [treating specialist] should have been obtained as to her current physical status and any treatment plans that might have been planned. Such [medical evidence] would be needed before one could make any projected [residual functional capacity] for this [claimant]. Given the subacute onset date, it would be quite likely that her symptoms would resolve and allow [a lifting capacity] of 25 [pounds] with unlimited reaching within 12 months.

(R. 388.)

On August 8, 2021, at another annual wellness checkup, Dorossett's primary care provider indicated that she would "[c]ontinue Celebrex" for her dorsalgia and polyarthritis, and further noted that she was "stable on Celebrex." (R. 395.)

At the December 1, 2021 hearing before the ALJ, Derossett testified that she was unable to finish the prescribed course of physical therapy. Derossett testified that she "quit going" to physical therapy because she "kept getting these hospital bills [she] could not afford" and she "could not afford the insurance." (R. 38-39.) She said that she "had already been ... in the situation where the hospital was trying to garnish [her] wages" and she "had to go get ... legal aid to stop the garnishment," so she "definitely didn't want to go through that again." (R. 39; *see also* R. 49 (reiterating that she could not go to physical therapy because she could not pay the bills for the physical therapy).)

When the ALJ inquired as to Derossett's medical insurance, Derossett responded that she had "Obama plan or some minimal insurance" that only paid for a "yearly check-up, and stuff like that."[9] (R. 39-40.) She indicated that, due to her finances,[10] "when the pain is really bad, that's the only time I go to the doctor." (R. 42.) When asked how she had been supporting herself, Derossett testified that her boyfriend paid her utilities and that her older brother would "pitch in" if she had "any kind of problems." (R. 34.)

Derossett also testified that, when she went to her doctor for treatment for her arthritis, a nurse practitioner prescribed her Celebrex, but she "couldn't afford it." (R. 39.) She testified that, in lieu of Celebrex, she had "just been eating Motrin and Tylenol," and also rook Aleve. (R. 39-40.) When the ALJ asked Derossett if she had informed her doctor that she could not afford the prescribed medication so that the provider could consider an alternative, Derossett replied that she "told [her primary care provider] that [she] couldn't afford it" and she "did let [her primary care provider] know." (R. 39.)

When the ALJ asked Derossett why she could not work, her chief complaint was, since "one of her shoulders locked up" and she was sent to physical therapy, her arthritis "has been compromised worse" so that she did not have the strength and stamina to "stand up and be any more with [her] arms up all the time" as she had been doing in her job as a

---

[9] The medical record indicates that Derossett did obtain annual exams from her primary care provider. (R. 394-396.)

[10] Derossett testified that she was given a leave of absence from her job as a hairdresser to complete physical therapy. (R. 37, 42-43.)  Her employer told her that, to be allowed to return to work, she "would have to bring that paperwork back from physical therapy." (R. 43.) Later, in the course of applying for food stamps, Derossett found out that her employment had been terminated. (R. 42-43.) Derossett testified that, for the first time since attaining a cosmetology license in 1983, she did not renew that license in 2021 because she could not afford it. (R. 34.)

cosmetologist. (R. 36.) She testified that her arthritis affected her hands so that she could not open lids on pop bottles and could not hold more than three pounds. (R. 44.) She stated that she was "in pain all the time" and felt like she needed to go back to the doctor because of stabbing pain in the area of both thumbs that felt like "someone's sticking an ice pick in both of [her] hands." (*Id*.) She stated that, because of her arthritis, she did not "have any strength in [her] hands, and [her] dexterity is not what it used to be." (*Id*.) The pain was so bad that it interfered with her sleep on some nights. (*Id*.) She testified that, in her daily activities, she did "light housework," by which she meant that she used a lightweight handheld vacuum "that can go around the kitchen real quick,"[11] but that she did not "lift anything."[12] (R. 45-46.) She also stated that pain from her cervical spine prevented her from moving her head from side to side and that, because of this, her arthritis, and difficulty sitting for long periods, she did not drive. (R. 45, 47.)

2.    Analysis

When a claimant attempts to establish a disability based on testimony of their symptoms, the claimant must show "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b)

---

[11] Derossett testified that the handheld vacuum was a "cheapy vacuum" that weighed "about five pounds maybe, three pounds. Probably doesn't weigh that much." (R. 45.) She could no longer use her large Kirby vacuum cleaner because she "c[ouldn't] even pick [it] up any more." (R. 45-46.)

[12] In his brief, the Commissioner points out that, on an October 21, 2020 form Derossett submitted, she self-reported more extensive activities of daily living, such as weed eating and mowing. (R. 221-22.) She stated that she needed help or encouragement doing those things "now ... because [she] will hurt and be tired after most of them." (R. 221.) However, the ALJ did not rely on the self-reported symptoms on that form, nor did the ALJ comment on any discrepancy, if any, between Derossett's answer on the form and her testimony at the hearing.

that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). "A claimant's testimony coupled with evidence that meets this standard 'is itself sufficient to support a finding of disability.'" *Milton v. Kijakazi*, No. 2:21-CV-428-SMD, 2022 WL 17128524, at *4 (M.D. Ala. Nov. 22, 2022) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted)).

When, as here, the ALJ finds that medical signs and laboratory findings demonstrate a medically determinable impairment or set of impairments that could reasonably be expected to produce the claimant's symptoms (R.19), then the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine how those symptoms limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c); 20 C.F.R. § 416.929(c). "In evaluating the claimant's subjective symptoms, the ALJ may consider a variety of factors, including ... objective medical evidence, treatment history, response to medication and other treatments, sources of pain relief, and the claimant's daily activities." *Milton*, 2022 WL 17128524, at *4 (citing 20 C.F.R. § 404.1529(c)(1)-(4)). "If the ALJ discredits subjective testimony, [s]he must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. "Where a claimant's treatment history is inconsistent with her subjective complaints or she fails to follow prescribed treatment that might alleviate her symptoms, the ALJ may find that her subjective testimony is inconsistent with the overall evidence in the record." *Douglas v. Comm'r, Soc. Sec. Admin.*, 832 F. App'x 650, 657 (11th Cir. 2020) (citing Social Security Regulation ("SSR") 16-3p, 82 Fed. Reg. 49462-03, 49466 (Oct. 25, 2017)).

"Nonetheless, the ALJ may not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue medical treatment without first considering any explanations that might explain the failure to seek or pursue treatment." *Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 487 (11th Cir. 2012); *see also* SSR 16-3P (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *10 (providing that the Commissioner (1) "will consider and address reasons for not pursuing treatment that are pertinent to an individual's case;" (2) "will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them;" and (3) "will explain how [the Commissioner] considered the individual's reasons in [the Commissioner's] evaluation of the individual's symptoms"). "'While failure to seek treatment is a legitimate basis to discredit the testimony of a claimant, it is the law in this circuit that poverty excuses non-compliance with prescribed medical treatment or the failure to seek treatment.'" *McElroy v. Kijakazi*, No. 1:20-CV-1040-KFP, 2022 WL 3221222, at *5 (M.D. Ala. Aug. 9, 2022) (quoting *Sims v. Astrue*, No. 3:09CV366-CSC, 2010 WL 2952686, at *5 (M.D. Ala. July 26, 2010)); *see also Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) ("We agree with every circuit that has considered the issue that poverty excuses noncompliance.").

Therefore, an ALJ must consider whether the claimant can afford medical care before denying an application primarily because the claimant failed to obtain or comply with that medical care. *Brown v. Comm'r of Soc. Sec.*, 425 F. App'x 813, 817 (11th Cir. 2011). "Nevertheless, if the claimant's failure to follow medical treatment is not one of the

principal factors in the ALJ's decision, then the ALJ's failure to consider the claimant's ability to pay will not constitute reversible error." *Id*. (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003)). In other words, where the ALJ's decision is not "primarily ... based on factors other than the claimant's failure to obtain medical treatment," then the "ALJ's failure to consider [the] claimant's ability to pay [is] not reversible error." *Id*. (citing *Ellison*, 355 F.3d at 1275); *see also Bellew v. Acting Com'r of Soc. Sec*., 605 F. App'x 917, 921 (11th Cir. 2015) ("Where the ALJ did not rely significantly on the claimant's noncompliance, ... the ALJ's failure to consider evidence regarding the claimant's ability to afford her prescribed treatment does not constitute reversible error." (citing *Ellison*, 355 F.3d at 1275)).

It is undisputed that Derossett testified that she was unable to afford physical therapy, her prescribed medication, and other medical care. It also cannot reasonably be disputed that the ALJ relied on Derossett's lack of medical treatment in discrediting her subjective testimony as to the limiting effects of her symptoms and medical conditions. (*See*, *e.g.*, R. 21 (referring to "the claimant's lack of regular treatment for musculoskeletal complaints over the course of the period for review" in discounting Derossett's subjective testimony about the limiting effects of her symptoms and conditions)). Finally, although the ALJ inquired into Derossett's ability to afford medical care at the hearing,[13] it cannot reasonably be disputed that, in relying on the lack of treatment to discount Derossett's subjective testimony about the limiting effects of her symptoms and conditions, the ALJ

---

[13] In addition, in a December 21, 2021 letter to the ALJ, Derossett argued that, "because she was no longer working," she "had trouble ... obtaining medical treatment on a regular basis." (R. 312.)

failed to mention, must less discuss, Derossett's statements regarding her inability to afford medical care. Therefore, the ALJ committed reversible error if the ALJ relied heavily on the failure to obtain care.

Derossett's testimony, if credited, demonstrates that her failure to seek more extensive medical treatment was due to her inability to afford it. Neither could she afford to undergo the full course of the recommended physical therapy that was predicted to alleviate her symptoms. Yet, the majority of the factors on which the ALJ relied in discounting Derossett's subjective testimony about the limiting effects of her impairments and symptoms were either directly related to or inextricably intertwined with Derossett's failure to obtain care. In determining that Derossett's impairments were "not of a disabling degree," the ALJ expressly stated that she "c[ould] not ignore [Derossett's] lack of regular treatment for musculoskeletal complaints over the course of the period for review." (R. 21.) The ALJ also noted that "there is no evidence of the claimant's recurrent presentations to the emergency room for exacerbations of her pain or other related symptoms." (R. 22.) The ALJ made no findings, however, as to the effect, if any, of Derossett's alleged inability to pay on her failure to obtain more regular treatment and make more emergency room visits.

In addition to statements expressly relying on Derossett's lack of consistent treatment, the ALJ also heavily relied on the lack of objective medical findings in the record that supported Derossett's subjective testimony. The lack of supportive medical findings in the record, in turn, is inextricably intertwined with the lack of ongoing treatment by providers who could make those objective findings. Therefore, the lack of supportive

17

objective medical findings in the record is intertwined with Derossett's testimony that she could not afford (and did not obtain) medical care during the relevant time period because she was unemployed and had minimal insurance.

Not coincidentally, the gap in the medical record extends for most of the relevant time period, beginning in October 2020 when Derossett ceased going to physical therapy (not long after the onset of symptoms and shortly after she stopped working as a hairdresser), and continuing until Derossett's August 2021 annual visit to her primary care provider (which she testified was covered by insurance). Within this context, lack of ability to afford care, if believed, could reasonably account for, or heavily contribute to, the following reasons on which the ALJ relied in discounting Derossett's subjective testimony: "the record fails to suggest that [Derossett] experienced ongoing, substantial musculoskeletal symptoms or abnormal findings that would be consistent with an individual experiencing disabling functional limitations;" "diagnostic imaging of record was not indicative of impairments that would produce disabling functional limitations;"[14] "the claimant has not been observed to have ongoing neurologic deficits in the upper or

---

[14] The only diagnostic imaging the ALJ referenced was an x-ray of Derossett's cervical spine that Dr. Chitwood reviewed when he referred her to physical therapy. (R. 411.) As the ALJ acknowledged, that x-ray "reflected [Derossett]'s degenerative disc disease at the C6-7 level with a loss of the normal cervical lordosis." (R. 20-22.) To the extent that any other diagnostic imaging failed to confirm disabling functional limitations, the lack of additional confirmation is due to the *nonexistence* of other diagnostic imaging, which, in turn, is consistent with Derossett's alleged financial inability to pursue more extensive treatment. The obvious connection between lack of treatment and lack of more diagnostic imaging is further cemented by the fact that, in referring Derossett to the course of physical therapy Derossett ultimately abandoned for financial reasons, Dr. Chitwood indicated that, if Derossett did not improve, "the next step would be to get an MRI of her neck." (*Id.*) Again, Derossett's testimony, if credited, would demonstrate that she could not afford that "next step."

lower extremities, such as reflex and sensory abnormalities, motor incoordination, or significant decrease in muscle strength;" "surgical intervention has not been recommended;"[15] "no muscle atrophy, persistent limitation of range of motion, or significant spasm has been documented in the record;"[16] "there is no evidence that

---

[15] The ALJ "emphasize[d] that surgical intervention" was never recommended. (R. 22.) Multiple record sources indicate that Derossett was projected to improve with physical therapy. (*See, e.g.*, R. 369, 372, 374, 376-77, 379, 381, 383, 385, 387; *see also* R. 388.) Dr. Blacklund noted in his November 23, 2020 records-based medical evaluation that Derossett's treatment with physical therapy and some medication "does take time to help, and, if not, surgery would then be indicated." (R. 388.) However, Derossett testified that she could not afford to complete the recommended course of physical therapy. (R. 38-40.) "It is true that 'poverty excuses noncompliance' with a prescribed course of treatment, since to 'a poor person, a medicine that he cannot afford to buy does not exist[.]" *Johnson v. Kijakazi*, No. CV 2:20-00604-N, 2022 WL 4686922, at *11 (S.D. Ala. Sept. 30, 2022) (quoting *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) (quotation omitted)). In any event, Derossett's testimony, if credited, would demonstrate that she could not afford to consult with a specialist about the advisability of surgery, or to pay for surgery.

[16] Yet, at the initial physical therapy examination on September 22, 2020, the physical therapist expressly noted the presence of "bilateral posterior deltoid" "muscle atrophy." (R. 363, *see also* R. 57, 64.) As the ALJ noted, Derossett

> presented for an initial physical therapy evaluation with Dale Medical Center and received assessments of cervical region radiculopathy, abnormal posture, and weakness. Notations specifically referenced the claimant's two- month history of neck and arm pain with radiating symptoms into the distal left arm. On examination, the claimant was found to have decreased range of motion; cervical muscle strength at 3/5 or 3+/5; shoulder flexion at 4/5; shoulder external rotation of 3+/5 and 3/5; and wrist extension of 4+/5. The claimant was also observed to have positive neural tissue tension of the median nerve, positive cervical quadrant testing on the left, and positive Spurling's Maneuver testing on the left.

(R. 21.) Physical therapy notes over the course of her treatment documented problems with "painful and decreased cervical [range of motion]," "abnormal cervical and thoracic posture," "poor postural control and awareness," and "muscle imbalances causing weakness during functional activities such as reaching, transfers, and gait." (R. 362-65, 369, 372, 374, 376, 379, 381, 383, 385, 387.) These problems were improving (and were projected to continue to improve) with physical therapy. (R. 372, 374, 376-77, 379, 381, 383, 385, 387.)

However, at Derossett's most recent medical visit, her annual wellness check in August 2021, she was observed to have intact bilateral muscle tone and strength, no joint swelling or deformity, and a steady, unassisted gait. (R. 394.) Her polyosteoarthritis was noted to be stable on Celebrex. (*Id.*)

[Derossett] has experienced totally debilitating functional limitations as a result of any musculoskeletal impairment;" "no treating or consultative[17] physician has persuasively opined that [Derossett] possessed disabling functional limitations as a result of any condition or from any resulting symptoms;" "there is no *objective*[18] documentation that the claimant's performance of daily activities has been substantially impaired due to her diagnosed conditions;" and "the record fails to document persistent, reliable manifestations of a disabling loss of functional capacity by the claimant resulting from her reported symptomology." (R. 21-22 (emphasis added).).

---

*But see Smith v. Comm'r of Soc. Sec.*, No. 23-10157, 2024 WL 963725, at *4 (11th Cir. Mar. 6, 2024) (noting that "[w]hether a condition is 'stable' ... says little on its own about whether the condition is disabling"). For her dorsalgia and polyosteoarthritis, the plan was to continue treatment with Celebrex. (R. 395.) However, at the hearing before the ALJ, Derossett testified that she could not afford Celebrex and that she had told her primary care doctor about her inability to afford prescription medication. (R. 39-40.) Thus, to the extent the ALJ may have implied that she relied on the findings from August 2021 regarding inconsistent objective findings as to muscle tone and gait, the August 2021 findings nevertheless introduce a separate issue regarding which the ALJ was required to discuss Derossett's alleged inability to afford care.

[17] It is undisputed that Derossett missed a consultative examination scheduled by the ALJ for reasons unrelated to poverty. (R. 16.) The ALJ did not rely on Derossett's failure to obtain a consultative exam in discounting her subjective testimony about the limiting effects of her impairments or in addressing the lack of medical evidence. Rather, the ALJ found that Derossett's full wellness examination performed in August 2021 was "an adequate substitute for the consultative evaluation." (R. 16.) In any event, the Commissioner does not argue that Derossett's failure to attend the consultative examination excuses the ALJ's failure to address the impact of Derossett's alleged poverty on her claim.

[18] This finding by the ALJ quite clearly addresses the lack of *objective* findings supporting Derossett's subjective statements as to her daily activities, not a finding that Derossett's own subjective statements regarding her daily activities are inconsistent with each other. Yet, the Commissioner argues in its brief that Derossett's own subjective description of her daily activities in the October 21, 2020 form she submitted demonstrated that she was not as functionally limited as she alleged. (Doc. No. 20 at 10.) This argument misses the mark. The ALJ did not rely on Derossett's own allegedly inconsistent *subjective*, self-reported daily activities to discredit either Derossett's subjective testimony about the limiting effects of her medical conditions or her testimony that her failure to seek medical care was due to an inability to afford it.

These reasons all turn largely or entirely on *lack* of objective medical findings to support Derossett's subjective testimony, or on Derossett's failure to obtain consistent medical care. Yet, Derossett's testimony, if believed, would establish that her inability to afford consistent treatment played a significant role in the paucity of objective findings in the medical record. Thus, the ALJ heavily relied on factors that are inextricably intertwined with Derossett's failure to obtain treatment and her testimony that she could not afford to seek ongoing medical care. *See Alisa M. v. Comm'r, Soc. Sec. Admin.*, No. 1:21-CV-559-CCB, 2022 WL 16752091, at *6 (N.D. Ga. Sept. 30, 2022) (finding that, where "the ALJ discredited Plaintiff's testimony regarding the severity of her pain based on her lack of pain medication ... , a lack of treatment from February of 2019 to March of 2020, and her daily activities," "Plaintiff's gaps in treatment and lack of medication form at least a significant basis for the denial of benefits such that the ALJ should have both determined whether Plaintiff could afford the recommended surgeries and considered the reasons Plaintiff did not take medication"); *Wiedmeier v. Berryhill*, No. 1:17-CV-256-AT, 2018 WL 6839259, at *2 (N.D. Ga. Feb. 22, 2018) (determining that "the ALJ did rely 'primarily' on a lack of treatment or other factors directly related to [the claimant's] inability to afford treatment in deciding to deny benefits" where "the inability to afford treatment played a significant role in the 'thinness' of the record" such that three of four reasons the ALJ gave for the credibility determination "potentially derive from Plaintiff's inability to afford treatment;" those four reasons were "lack of objective medical evidence;" (2) "no record of ongoing complaints due to any impairment;" (3) "an unremarkable physical exam;" and (4) "the

claimant's use of over-the-counter pain medication which, along with exercise, relieve her pain" (internal quotation marks omitted)).

Further, as the ALJ noted, according to the most recent medical record available, which was from Derossett's August 2021 annual wellness visit, Derossett's primary care provider found her "polyarthritis/dorsalgia/polyosteoarthritis to be stable on Celebrex as needed."[19] (R. 21.) Nevertheless, at the hearing, Derossett testified that she could not afford to take Celebrex, so she instead heavily relied on over-the-counter medications without gaining sufficient relief. (R. 39-40.) In disregarding Derossett's subjective testimony, the ALJ noted: "there is no indication that [Derossett's] impairments would be resistant to either alleviation or control with the proper and regular use of the appropriate prescription medications, if taken as prescribed." (R. 22.) However, "'[t]o a poor person, a medicine that [s]he cannot afford to buy does not exist.'" *McElroy*, 2022 WL 3221222, at *5 (M.D. Ala. Aug. 9, 2022) (quoting *Dawkins*, 848 F.2d at 1213 (quoting in turn *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987))). "Therefore, 'when a "claimant cannot afford the prescribed treatment and can find no way to obtain it, the condition that is disabling in fact

---

[19] "Whether a condition is 'stable' ... says little on its own about whether the condition is disabling," as a condition may be "stable" at any functional level, even a low one. *Smith v. Comm'r of Soc. Sec.*, No. 23-10157, 2024 WL 963725, at *4 (11th Cir. Mar. 6, 2024). Moreover, to the extent that there is any apparent conflict between the primary care provider's finding that Derossett was "stable on Celebrex" and Derossett's testimony that she could not afford Celebrex, the ALJ did not address any such conflict or even ask questions about it at the hearing. It is not the province of this Court to reweigh the evidence and make credibility determinations, particularly where the ALJ failed to address that evidence in the first place. *See Bellew v. Acting Com'r of Soc. Sec.*, 605 F. App'x 917, 920 (11th Cir. 2015); *see also Smith*, 2024 WL 963725, at *3 ("The ALJ also must state with some measure of clarity the grounds for her decision, and we will not affirm 'simply because some rationale might have supported the ALJ's conclusions.'" (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011)).

continues to be disabling in law."'" *Id.* (quoting *Dawkins*, 848 F.2d at 1213 (quoting in turn *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986))).

As the Commissioner seems to allude to in his brief, before discussing her analysis of whether the record supported Derossett's subjective testimony about the limiting effects of her impairments, the ALJ summarized the medical evidence of record. (R. 20-21.) In discounting Derossett's testimony, the ALJ remarked that she "acknowledge[d] the blend of normal and abnormal examination findings when treatment was obtained." (R. 21.) However, under the circumstances, a summary of the sparse medical record, standing alone, and an acknowledgement that even the sparse record contained mixed findings, is not sufficient to overcome the ALJ's failure to address Derossett's inability to pay. On the whole, the ALJ appears to have relied more on the lack of treatment and the lack of objective medical findings in the record than on anything else, which, in turn, required the ALJ to consider Derossett's alleged inability to pay. *See Alisa M.* 2022 WL 16752091, at *6 (finding that, although the ALJ summarized the objective medical evidence, which contained both normal and abnormal results, the ALJ did not "explain which portions of it support his disability determination. And while that is not generally necessary, in comparing the objective bases for his decision with his emphasis on Plaintiff's lack of treatment, the lack of treatment seems to be an equal, if not greater, basis than anything else he relied upon.").

In sum, in discounting Derossett's testimony as to the limiting effects of her symptoms and conditions, the ALJ relied primarily on Derossett's failure to obtain medical care and on factors that are inextricably intertwined with that failure to obtain care.

Therefore, as a matter of law, the ALJ failed to correctly apply the law by failing to address Derossett's testimony regarding her inability to afford medical care and prescription medications. *Nunn v. Kijakazi*, No. 2:20-CV-13, 2021 WL 3503957, at *3 (S.D. Ga. July 19, 2021), *report and recommendation adopted*, No. 2:20-CV-13, 2021 WL 3502255 (S.D. Ga. Aug. 9, 2021) ("If the Commissioner fails either to apply correct legal standards or to provide the reviewing court with the means to determine whether correct legal standards were in fact applied, the court must reverse the decision." (citing *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982), *overruling by statute on other grounds recognized by Lane v. Astrue*, No. 8:11-CV-345-T-27, 2012 WL 292637, at *4 (M.D. Fla. Jan. 12, 2012)); *see also* SSR 16-3P, 2017 WL 5180304, at *10 (providing the Commissioner (1) "will consider and address reasons for not pursuing treatment that are pertinent to an individual's case" and (3) "will explain how [the Commissioner] considered the individual's reasons" in evaluating "the individual's symptoms").

Accordingly, the Commissioner's decision is due to be reversed and this case is due to be remanded for the Commissioner to consider whether (and, if so, how)[20] Derossett's testimony that she cannot afford medical care affected her non-compliance and whether

---

[20] The Court does not here weigh the evidence regarding the relationship, if any, between Derossett's alleged inability to afford medical care and her failure to obtain that care, the paucity of the record, or Derossett's subjective statements regarding the limiting effects of her impairments. The Court emphasizes that it does not require the ALJ to *accept* Derossett's allegation regarding her inability to afford medical treatment, but she is required to *consider* it in accordance with evidence and applicable law. (R. 394.) The Court "express[es] no opinion on whether [Derossett] can ultimately establish that she is disabled within the meaning of the Social Security Act." *Arce v. Comm'r of Soc. Sec.*, No. 23-11315, 2024 WL 36061, at *2 (11th Cir. Jan. 3, 2024).

her RFC requires further adjustments in light of that determination. *See Nunn*, 2021 WL 3503957, at *5 (S.D. Ga. July 19, 2021), *report and recommendation adopted*, No. 2:20-CV-13, 2021 WL 3502255 (S.D. Ga. Aug. 9, 2021) (recommending remand where "the ALJ did not acknowledge, let alone discuss, what effect Plaintiff's inability to pay for treatment had on her non-compliance with medical treatment"); *see also Jackson*, 99 F.3d at 1092 (11th Cir. 1996) (noting that a case may be remanded to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g) if the court finds "the Commissioner or the ALJ incorrectly applied the law relevant to the disability claim").

B.     Remaining Arguments

Derossett also argues that the case should be remanded because, for various reasons, in discounting Derossett's subjective testimony, the ALJ improperly "played doctor" by making findings that should have been made by a medical provider. (Doc. No. 17 at 15.) Additionally, Derossett argues that the Commissioner failed to develop the record by not including in the record initial-level medical record reviews from November 2020 that were completed by Drs. Alton James and Donald Hinton, along with two initial level disability findings. (Docs. No. 17-1 through 17-4.) Alternatively, Derossett argues that the case should be remanded pursuant to sentence six of 42 U.S.C. § 405(g) because the exhibits from the initial-level review that had been omitted from the record constitute new and material evidence that was omitted from the record for good cause. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1267 (11th Cir. 2007) ("A remand to the Commissioner is proper under sentence six when new material evidence that was not incorporated into the administrative record for good cause comes to the attention of the district court.").

Because remand is necessary, the Court does not reach Derossett's arguments with respect to these issues.

## VI.   CONCLUSION

After review of the administrative record, and considering all the arguments, the Court finds that Commissioner's decision to deny Derossett disability is not in accordance with applicable law. Therefore, it is ORDERED as follows:

1.   Derossett's motion for summary judgment (Doc. No. 17) is GRANTED.

2.   The Commissioner's motion for summary judgment (Doc. No. 20) is DENIED.

3.   The decision of the Commissioner is REVERSED and REMANDED for further proceedings not inconsistent with this opinion.

A separate judgment will issue.

DONE this 26th day of March, 2024.


_____
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE